Phil Telfeyan (*pro hac vice*)
Rebecca Ramaswamy (*pro hac vice*)
Attorneys, Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
rramaswamy@equaljusticeunderlaw.org

Robert Farris-Olsen (MT Bar No. 11937)
Scott Peterson (MT Bar No. 11996)
Attorneys, Morrison, Sherwood, Wilson & Deola, PLLP
401 N. Last Chance Gulch St.
Helena, MT 59601
(406) 442-3261
rfolsen@mswdlaw.com
speterson@mswdlaw.com
*Attorneys for Plaintiffs*

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA, BUTTE DIVISION**

MICHAEL DIFRANCESCO and ASHLEY DAVIS,

Plaintiffs,

v.

TIM FOX, in his official capacity as Attorney General of Montana; SARAH GARCIA, in her official capacity as Administrator of the Motor Vehicle Division; and MICHELE SNOWBERGER, in her official capacity as Bureau Chief of the Driver Services Bureau,

Defendants.

Case No. CV-17-66-BU-SEH

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iv

I. Introduction ........ 1

II. Defendants Have Violated Plaintiffs' Equal Protection and Substantive Due Process Rights by Discriminating on the Basis of Wealth ........ 1

A. Plaintiffs' Equal Protection Claim Is Subject to Strict Scrutiny ........ 2

i. Defendants' Statutory Scheme Is Based on an Indigence Classification under the *Griffin* Cases ........ 2

ii. Plaintiffs' Case Is Distinguishable from *San Antonio School District v. Rodriguez* ........ 5

B. Even under Rational Basis Review, Defendants' Suspension Scheme Fails ........ 9

i. The Challenged Suspension Scheme Is Not Rationally Related to the State Interest of Ensuring Court Appearance ........ 9

ii. The Challenged Suspension Scheme Is Not Rationally Related to the State Interest of Payment of Imposed Fines or Restitution ........ 10

iii. The Challenged Suspension Scheme Is Not Rationally Related to the State Interest of Deterring Criminal Conduct ........ 11

iv. The Challenged Suspension Scheme Is Not Rationally Related to the State Interest of Providing Alternatives to Jail ........ 12

III. Plaintiffs Have a Fundamental Right to Intrastate Travel that Is Implicated by Their Driver's License Suspensions ........ 12

IV. Defendants Concede that Plaintiffs Are Entitled to Due Process Before Their Driver's Licenses Are Suspended — and No Such Process Was Provided ........ 14

A. Plaintiffs Are Entitled to a Pre-Deprivation Hearing Considering Their Ability to Pay Before Their Licenses Are Suspended and Notice of that Opportunity ....................................................15

i. The *Mathews* Factors Weigh Heavily in Favor of the Guarantee of an Ability-to-Pay Hearing and Notice of that Hearing ....................................................................15

ii. *Dixon v. Love* Permits a Driver's License to Be Suspended Without a Pre-Deprivation Hearing Only in Emergency Circumstances ...............................................................18

iii. Mr. DiFrancesco Is Entitled to Due Process Even Though He Has Never Had a Driver's License .........................................19

B. Montana's Existing Statutory Scheme Does Not Provide Adequate Procedural Protections ...........................................................21

i. The Initial Opportunity to Contest a Violation Does Not Specifically Provide an Opportunity to Assert Inability to Pay ..................................................................................21

ii. Defendants Improperly Rely on an Assumption that Montana Judges Never Impose Fines that Individuals Cannot Afford to Pay ..........................................................................21

iii. The Pre-Suspension Notice Does Not Provide Instructions for Avoiding License Suspension by Asserting Inability to Pay ...23

V. Conclusion ...................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Bearden v. Georgia*, 461 U.S. 660 (1983) ........................................................ 3, 16
*Bell v. Burson*, 402 U.S. 535 (1971) ................................................... 15, 17, 19, 20
*Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016) ......................................... 14
*Dixon v. Love*, 431 U.S. 105 (1977) ........................................................ 15, 18, 19
*Griffin v. Illinois*, 351 U.S. 12 (1956) ...................................................................... 2, 3
*Harris v. McRae*, 448 U.S. 297 (1980) ..................................................................... 8
*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002) ........................... 13, 14
*King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646 (2d Cir. 1971) ................. 13
*Lutz v. City of York, Pa.*, 899 F.2d 255 (3d Cir. 1990) .......................................... 13
*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................................. 15
*Mayer v. City of Chicago*, 404 U.S. 189 (1971) ............................................... 3, 4, 5
*Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1 (1978) .......................... 23
*Nunez by Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997) ...................... 13
*Robinson v. Purkey*, 326 F.R.D. 105 (M.D. Tenn. 2018) .......................... 10, 16, 19
*San Antonio School District v. Rodriguez*, 411 U.S. 1 (1973) ........................ passim
*Tate v. Short*, 401 U.S. 395 (1971) ........................................................................... 3
*U.S. v. Barajas-Guillen*, 632 F.2d 749 (9th Cir. 1980) ........................................ 6, 8
*Williams v. Illinois*, 399 U.S. 235 (1970) ............................................................. 3, 4
*Wooley v. Maynard*, 430 U.S. 705 (1977) ............................................................... 16

**Statutes**

Mont. Code Ann. § 61-5-214(1)(a) ................................................................................ 9
Mont. Code Ann. § 61-5-215 .......................................................................................... 8
Mont. Code Ann. § 61-6-304 .................................................................................. 11, 23

## I. Introduction

Plaintiffs oppose Defendants' Motion for Summary Judgment (ECF No. 72) and respectfully ask this Court to deny Defendants' Motion and grant Plaintiffs' Motion for Summary Judgment as to Liability (ECF No. 69). Plaintiffs do not dispute any of the facts Defendants presented in their Statement of Undisputed Facts (ECF No. 74) or relied upon in their Brief in Support of their Motion for Summary Judgment (ECF No. 75). Defendants' motion should be denied because Defendants have violated Plaintiffs' Equal Protection and substantive Due Process rights by discriminating on the basis of wealth, Plaintiffs' fundamental right to travel is implicated by their driver's license suspensions, and Defendants have violated Plaintiffs' procedural Due Process rights by failing to provide pre-deprivation ability-to-pay hearings or notice of such hearings.

## II. Defendants Have Violated Plaintiffs' Equal Protection and Substantive Due Process Rights by Discriminating on the Basis of Wealth

Defendants' driver's license suspension scheme violates Plaintiffs' Equal Protection and substantive Due Process rights because it discriminates on the basis of wealth by imposing a punishment for nonpayment without any exception for indigence. Despite Defendants' arguments to the contrary, (A) Plaintiffs' Equal Protection claim is subject to strict scrutiny under Supreme Court precedent; and (B) even if rational basis review is applied, Defendants' suspension scheme cannot pass constitutional muster.

### A. Plaintiffs' Equal Protection Claim Is Subject to Strict Scrutiny

Defendants concede that the suspension scheme in question is subject to Equal Protection analysis as a statutory classification. *See* Defs.' Summ. J. Br., ECF No. 75 at 9. But Defendants' argument that the classification is subject only to rational basis review is incorrect for two reasons: (i) the statutory scheme is an indigence classification under the line of Supreme Court cases beginning with *Griffin v. Illinois* and is subject to the exacting scrutiny required by that precedent, 351 U.S. 12 (1956); and (ii) Plaintiffs' case is distinguishable from *San Antonio School District v. Rodriguez* and falls under *Rodriguez*'s stated exceptions for analyzing wealth-based discrimination under strict scrutiny. 411 U.S. 1 (1973).

#### i. Defendants' Statutory Scheme Is Based on an Indigence Classification under the *Griffin* Cases

For all the reasons stated in Plaintiffs' Summary Judgment Brief (ECF No. 71 at 9–19), Defendants' suspension of Plaintiffs' driver's licenses for nonpayment of court debt without any indigence exception amounts to wealth-based discrimination under the Supreme Court's *Griffin* cases, and the suspension scheme is therefore subject to heightened scrutiny. Defendants incorrectly assert that the statutory scheme in question is not a classification based on indigence, but the Supreme Court has unequivocally established that a statute that imposes a penalty for nonpayment, even a statute that is neutral on its face, nevertheless discriminates on the basis of wealth if it does not contain any exception based on indigence. *See Griffin*, 351 U.S.

at 12, 13 (holding that a requirement that individuals pay a fee for trial transcripts on appeal, although neutral on its face, had the effect of "deny[ing] adequate appellate review to the poor while granting such review to all others," which was unconstitutional); *see also Mayer v. City of Chicago*, 404 U.S. 189, 196–97 (1971) (extending *Griffin*'s logic to cases in which indigent debtors face a consequence other than imprisonment for nonpayment); *Williams v. Illinois*, 399 U.S. 235, 242 (1970) (The "statutory scheme does not distinguish between defendants on the basis of ability to pay fines. But, as we said in *Griffin* . . . a law nondiscriminatory on its face may be grossly discriminatory in its operation."); *Tate v. Short*, 401 U.S. 395, 397–98 (1971) (holding that a debtor could not be incarcerated to pay off traffic fines, emphasizing that the constitutional defect was not in the act of imposing a consequence for nonpayment, but in the fact that imposing that consequence upon an indigent person had the effect of imposing greater punishment based on the person's wealth); *Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983) (holding that a person's probation could not be revoked for failure to pay a fine without a finding that the person's nonpayment was willful or that alternative forms of punishment were inadequate). All of this Supreme Court precedent establishes and reinforces the principle that penalties for nonpayment require heightened scrutiny if they lack an exception for indigence.

Defendants interpret the Supreme Court's *Griffin* doctrine too narrowly when they claim that it applies only in cases involving incarceration or denial of access to courts. In *Mayer*, the Court expressly divorces the doctrine's logic from any contemplation of the "balance between the needs of the accused and the interests of society" and emphasizes that the "invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay is not erased by any differences in the sentences that may be imposed." 404 U.S. at 196–97. While *Mayer* involves access to courts, its outcome turns on the lack of distinction between a defendant facing imprisonment if he loses his appeal and a defendant facing a fine if he loses his appeal, *id.*; thus, *Mayer* stands for the principle that the severity of the consequence a person faces for nonpayment has no bearing on the question of whether that person faced the consequence *because of his indigence*. For this reason, Defendants' reliance on *Franceschi v. Yee* is misplaced: In *Franceschi*, the plaintiff did not base his claims on his indigence; in fact, he did not claim to be indigent at all, but rather attempted to justify his failure to pay his taxes on the basis that "he owed none." 887 F.3d 927, 933 (9th Cir. 2018).

Relatedly, the Supreme Court has described wealth-based discrimination as "accomplish[ing] indirectly as to an indigent that which cannot be done directly." *Williams*, 399 U.S. at 243. Again, the reasoning turns on whether the additional consequence was imposed *due to the defendant's indigence*. Plaintiffs are

challenging the suspensions they received when they were unable to pay fines for underlying offenses for which license suspension is not a permissible sentence. For example, Defendants suspended Ms. Davis's license when she failed (due to her indigence) to pay fines for insurance violations — there is no statutory basis for her license to have been suspended based solely on those underlying violations. Therefore, imposing license suspension as a consequence for nonpayment of the fines punishes Plaintiffs in a way that they could not have been punished if not for their indigence, and therefore constitutes wealth-based discrimination; a wealthier person who pays the fine cannot possibly face a license suspension for the insurance violations Ms. Davis received. To weigh the seriousness of driver's license suspension against the seriousness of imprisonment or lack of access to courts would be to entertain an analysis of the "balance between the needs of the accused and the interests of society," an approach the Supreme Court rejects. *Mayer*, 404 U.S. at 196.

#### ii. Plaintiffs' Case Is Distinguishable from *San Antonio School District v. Rodriguez*

The Supreme Court provided a summary of the characteristics of wealth-based classifications subject to heightened scrutiny under *Griffin* and its progeny in *San Antonio School District v. Rodriguez*, 411 U.S. 1, 20–22 (1973). Defendants erroneously characterize the Supreme Court's holding in *Rodriguez* as a rejection of the notion that courts may apply strict scrutiny to statutory classifications based on

wealth. *Rodriguez* does not hold that strict scrutiny never applies to wealth-based classifications. In fact, consistent with the *Griffin* cases, *Rodriguez* identifies "threshold considerations" that must be analyzed "[b]efore a State's laws and the justifications for the classifications they create are subjected to strict judicial scrutiny." 411 U.S. at 19. These threshold considerations consist of "two distinguishing characteristics" that a poverty class must satisfy: (1) whether "because of their impecunity they were completely unable to pay for some desired benefit," and (2) whether "as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit." *Id.* at 20; *see also U.S. v. Barajas-Guillen*, 632 F.2d 749, 753 (9th Cir. 1980). The *Rodriguez* factors further prove that Defendants' legal test — based on whether the case involves imprisonment or access to courts — is incorrect. The factors also demonstrate why Plaintiffs' wealth-based discrimination case is appropriate for strict scrutiny review.

The first threshold characteristic the Supreme Court identifies in *Rodriguez* is that the disadvantaged class must be "fairly definable as indigent;" that is, completely unable to pay for the desired benefit. *Rodriguez*, 411 U.S. at 22. The plaintiffs in *Rodriguez* represented families living in certain low-property-tax districts. The Supreme Court found that because there was "reason to believe that the poorest families are not necessarily clustered in the poorest property districts," the class was not "fairly definable as indigent" and therefore did not satisfy the first

"distinguishing characteristic of wealth classification." *Id.* at 22–23. In this case, by contrast, Plaintiffs are fairly definable as indigent. They are not representing a class of individuals whose indigence is assumed based on where they live — Plaintiffs are indigent. Pls.' Undisputed Facts, ECF No. 70 at ¶¶ 9, 10, 11, 27. Their poverty renders them completely unable to pay off their court debt to avoid license suspension. It is not the case that the cost of paying the debt is "great, but not insurmountable," nor are Plaintiffs "persons with relatively less money on whom designated fines impose heavier burdens." *Rodriguez*, 411 U.S. at 21–22. Rather, Plaintiffs are completely unable to pay. Plaintiffs have not managed to pay off their debt and get their licenses reinstated because they cannot do so without foregoing basic life necessities; that is, they are completely unable to pay the amount required. Thus, Plaintiffs satisfy the first *Rodriguez* characteristic.

The second threshold characteristic identified in *Rodriguez* is that the disadvantaged class must suffer "an absolute deprivation of the desired benefit." 411 U.S. at 23. The Supreme Court noted that the plaintiffs' argument in *Rodriguez* was "not that the children in districts having relatively low assessable property values [were] receiving no public education; rather, it [was] that they [were] receiving a poorer quality education than that available to children in districts having more assessable wealth." *Id.* This case is distinguishable because Plaintiffs have suffered an absolute deprivation of their driver's licenses and their ability to drive

legally. People whose licenses are suspended because of failure to comply with a sentence, including payment of fines, costs, or restitution, are not eligible to receive provisional, restricted, or probationary licenses. Mont. Code Ann. § 61-5-215. Therefore, Plaintiffs have no option that allows them to drive legally while their licenses are suspended, and their suspensions were the result of a complete inability to pay court debt. Thus, the second distinguishing characteristic is satisfied.

Because Plaintiffs satisfy the threshold requirements, their case is distinguishable from *Rodriguez*, and the wealth-based discrimination they face is subject to strict scrutiny analysis. *Rodriguez*, 411 U.S. at 20; *see also Barajas-Guillen*, 632 F.2d at 753. Defendants' additional Supreme Court invocations on this point are inappropriate for the same reason. *Harris v. McRae* does not preclude the application of strict scrutiny to wealth-based classifications; it merely states that "poverty, *standing alone* is not a suspect classification." 448 U.S. 297, 323 (1980) (emphasis added). This is consistent with *Rodriguez*'s requirement that a poverty class must satisfy the two threshold requirements discussed above before strict scrutiny is appropriate. *City of Cleburne* makes no mention of poverty classifications at all and does not claim to include an exhaustive list of all possible circumstances when strict scrutiny may apply. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440–42 (1985). Defendants' arguments that strict scrutiny does not apply are therefore unavailing.

### B. Even under Rational Basis Review, Defendants' Suspension Scheme Fails

For the reasons stated above and in Plaintiffs' Summary Judgment Brief (ECF No. 71 at 9–19), Defendants' wealth-based driver's license suspension scheme is subject to strict scrutiny. But even under rational basis review, the statutory scheme cannot pass constitutional muster because it is not rationally related to any conceivable state interest, including (i) ensuring court appearance, (ii) ensuring payment of imposed fines and restitution, (iii) deterring criminal conduct, and (iv) providing alternatives to jail.

#### i. The Challenged Suspension Scheme Is Not Rationally Related to the State Interest of Ensuring Court Appearance

Defendants' suspension scheme, to the extent it punishes failure to pay, is not rationally related to the state interest of ensuring court appearance. Montana law separately provides that a person's driver's license must be suspended if that person fails to appear in court. Mont. Code Ann. § 61-5-214(1)(a). This provision falls outside the scope of Plaintiffs' lawsuit, which instead challenges suspensions imposed based on failure to pay fines, costs, or restitutions. Even if the challenged provision were struck down, Defendants would still be authorized to issue suspensions based on failure to appear. Therefore, the suspensions relevant to this lawsuit are unrelated to the state interest of ensuring court appearance.

**ii. The Challenged Suspension Scheme Is Not Rationally Related to the State Interest of Payment of Imposed Fines or Restitution**

Defendants' suspension scheme is not rationally related to the state interest of ensuring payment of imposed fines and restitution. As Plaintiffs argued in their Summary Judgment Brief (ECF No. 71 at 17–18), suspending licenses to encourage payment of court debt is irrational and counterproductive when applied to indigent drivers because a person who is *unable* to pay only becomes *less* able to pay when her driver's license is suspended. A person who cannot reliably get to work because she cannot drive is unlikely to be able to obtain or maintain steady employment, and therefore cannot earn enough money to pay off her court debt. Moreover, license suspension can create additional difficulties in carrying out everyday responsibilities that end up costing more money; people who cannot drive themselves around may have to pay for expensive private transportation, which is often unaffordable for people living in poverty. Taking away transportation options (or making transportation more expensive) makes it harder for people to earn money and costs them more money. Thus, suspension subverts any legitimate state interest in collecting outstanding court debt. *See Robinson v. Purkey*, 326 F.R.D. 105, 157 (M.D. Tenn. 2018) ("There is reason to believe that taking away a driver's license is not merely out of proportion to the underlying purpose of ensuring payment, but affirmatively destructive of that end.").

### iii. The Challenged Suspension Scheme Is Not Rationally Related to the State Interest of Deterring Criminal Conduct

Defendants' suspension scheme is not rationally related to the state interest of deterring criminal conduct. First, occasional minor traffic violations are virtually inevitable for people who regularly drive, and people who cannot afford to pay fines already have good reason to avoid breaking the traffic laws and incurring court debt that they cannot afford. Some offenses, like Ms. Davis's insurance violations, are the direct result of poverty and cannot be avoided no matter how strong the motivation. Moreover, there is no reason that people living in poverty deserve to be subjected to harsher punishments as a means of deterrence than those who can easily pay off a traffic fine, avoid suspension, and live to speed another day. In fact, this disparity in the severity of punishments for indigent individuals compared to wealthier individuals is a key element of wealth-based discrimination.

Plaintiffs' underlying offenses already have penalties designed to deter their commission; the fact that the penalties for those offenses does not include license suspension illustrates that the legislature believes that deterrence will be adequately served through these other means. For example, the state has determined that the appropriate way to deter insurance violations is to impose fines. Mont. Code Ann. § 61-6-304. The state has not even made license suspension a *possible consequence* for that offense (until a fourth or subsequent violation), *id.*; the suspension is not for the offense itself, but for inability to pay the fine. Penalizing someone for inability

to pay is unrelated to deterring the underlying offense, and the state's statutory scheme makes this apparent by not including suspension as a possible penalty for the offense itself.

#### iv. The Challenged Suspension Scheme Is Not Rationally Related to the State Interest of Providing Alternatives to Jail

Defendants' suspension scheme is not rationally related to the state interest of providing alternatives to jail. Jailing individuals who fail to pay their traffic fines due to indigence would be unconstitutional for many of the same reasons that suspending their driver's licenses is unconstitutional. The state of Montana has many options for enforcing its laws and collecting its debts that do not violate its residents' constitutional rights, including community service, affordable payment plans, and other alternatives that account for indigence. Given the lack of any rationale or logic behind this interest, it is no surprise that Defendants offer virtually no substantive reasoning in their brief to support this justification.

## III. Plaintiffs Have a Fundamental Right to Intrastate Travel that Is Implicated by Their Driver's License Suspensions

For all the reasons stated in Plaintiffs' Summary Judgment Brief (ECF No. 71 at 19–23), Defendants' suspension scheme strips Plaintiffs of their mobility, implicating their constitutional right to travel. The Ninth Circuit has never definitively decided whether the constitutional right to travel extends to travel within a state. *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 n.7 (9th Cir.

1997) ("We express no opinion on [whether the Constitution guarantees the fundamental right of intrastate travel]."). But several other federal appellate courts have recognized such a right. *See, e.g.*, *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) ("It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state."); *see also Lutz v. City of York, Pa.*, 899 F.2d 255, 256 (3d Cir. 1990) ("[a] constitutional right of *intra*state travel . . . exists, and grows out of substantive due process.") (emphasis in original); *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002) (holding that the Due Process Clause of the Fourteenth Amendment protects the "right to travel locally through public spaces and roadways.").

Although Plaintiffs are not expressly prohibited from traveling, taking away their driver's licenses because they cannot afford to pay fines is a significant deprivation. Public transportation in Montana is extremely limited and an unrealistic option for meeting life's basic needs. Pls.' Undisputed Facts, ECF No. 70 at ¶¶ 60–61. Plaintiffs do not have access to other modes of transportation. *Id.* at ¶¶ 8, 33, 61. Taxis and car services are prohibitively expensive for everyday use, and Montana's harsh winters make walking and biking impractical and even dangerous on some days. *Id.* at ¶ 62. Thus, Plaintiffs "depend on" driving "to carry out [their] daily life activities," *Johnson*, 310 F.3d at 498, and Montana's suspensions infringe

on their fundamental rights. Plaintiffs' "right to travel locally through public spaces and roadways — perhaps more than any other right secured by substantive due process — is an everyday right, a right [they] depend on to carry out [their] daily life activities. It is, at its core, a right of *function*." *Johnson*, 310 F.3d at 498 (emphasis added). By suspending Plaintiffs' driver's licenses, Defendants have imposed a functional ban on their intrastate travel that constitutes far more than a restriction on travel that lasts a few hours or only covers a few blocks. *Cole v. City of Memphis*, 839 F.3d 530, 537 (6th Cir. 2016) (noting that strict scrutiny is appropriate where an intrastate travel restriction imposes a broad prohibition). Rather, it forecloses all travel because driving is Plaintiffs' only practical means of transport.

## IV. Defendants Concede that Plaintiffs Are Entitled to Due Process Before Their Driver's Licenses Are Suspended — and No Such Process Was Provided

Defendants concede that Plaintiffs are entitled to notice and an opportunity to be heard, Defs.' Summ. J. Br., ECF No. 75 at 16, but Defendants incorrectly assert that the procedures provided in Montana satisfy the requirements of due process. Defendants' suspension scheme violates Plaintiffs' procedural Due Process rights because (A) Plaintiffs are entitled to a pre-deprivation hearing considering their ability to pay before their licenses are suspended, as well as notice of that opportunity; and (B) Montana's existing statutory scheme does not provide adequate procedural protections.

### A. Plaintiffs Are Entitled to a Pre-Deprivation Hearing Considering Their Ability to Pay Before Their Licenses Are Suspended and Notice of that Opportunity

Plaintiffs are entitled to a pre-deprivation hearing considering their ability to pay before their licenses are suspended — and notice of that opportunity — because (i) the *Mathews v. Eldridge* factors weigh in favor of the guarantee of an ability-to-pay hearing and notice of that hearing, 424 U.S. 319 (1976); (ii) *Dixon v. Love* allows a driver's license to be suspended without a pre-deprivation hearing only in emergency circumstances, 431 U.S. 105 (1977); and (iii) despite Defendants' arguments to the contrary, Mr. DiFrancesco is entitled to due process even though he has never had a driver's license.

#### i. The *Mathews* Factors Weigh Heavily in Favor of the Guarantee of an Ability-to-Pay Hearing and Notice of that Hearing

The procedural due process factors identified by the Supreme Court in *Mathews v. Eldridge* weigh in favor of guaranteeing an ability-to-pay hearing before suspension and notice of such an opportunity to be heard. 424 U.S. at 335.

The first *Mathews* factor, the private interest affected, is significant, as the ability to drive legally is paramount in Montana. The Supreme Court has explicitly held that a property interest in a driver's license is so significant that it requires (except in emergency circumstances) a pre-deprivation hearing. *Bell v. Burson*, 402 U.S. 535, 542 (1971) ("[E]xcept in emergency situations (and this is not one)[,] due

process requires that when a State seeks to terminate an interest such as that here involved, it must afford notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective.") (internal quotation marks omitted). As Plaintiffs discussed in their Summary Judgment Brief (ECF No. 71 at 16), a driver's license is often necessary for finding and maintaining employment, and it is essential for carrying out the duties and responsibilities of everyday life, especially in a state like Montana, where distances are vast and public transportation is often unavailable. Pls.' Undisputed Facts, ECF No. 70 at ¶¶ 60–64; *see also Wooley v. Maynard*, 430 U.S. 705, 715 (1977) ("[D]riving an automobile" is "a virtual necessity for most Americans."). The loss of a license can directly affect a person's livelihood, interfere with the ability to care for one's children and other dependents, make it difficult or impossible to go to the doctor or shop for food, render a person helpless in the event of an emergency — the list of potential consequences goes on. *Robinson*, 326 F.R.D. at 156. Because of the great — even unforeseeable — scope of the consequences, the nature of the interest affected by these suspensions is serious, and robust procedural due process is required.

Regarding the second *Mathews* factor, the risk of erroneous deprivation is great. For indigent Montanans, the liability necessary to justify suspension includes the willfulness of the nonpayment; non-willfulness erodes Plaintiffs' liability in a failure-to-pay charge. *See, e.g.*, *Bearden*, 461 U.S. at 660. Thus, an ability-to-pay

hearing is required to determine willfulness before suspension. *See Bell*, 402 U.S. at 536–37 ("[T]he State's statutory scheme, in failing before suspending the licenses to afford [the motorist] a hearing *on the question of his fault or liability*, denied him due process") (emphasis added). Defendants effectively concede, as they must, that a suspension for non-willful nonpayment would be erroneous. Such suspensions for non-willful nonpayment are repugnant to the state's interests, which even Defendants argue are designed to protect indigent drivers. Because it would be erroneous to suspend a license for non-willful nonpayment, a hearing on the question of willfulness is essential for avoiding erroneous suspensions.

Finally, the third *Mathews* factor — the government's interest, including the burden of additional procedural requirements — weighs in Plaintiffs' favor. In this case, the government's interests pale in comparison to the significance of the private interest at stake, since the state action in question — license suspension — bears no rational relationship to any legitimate state interest (at least not for people who are indigent). Moreover, the burden of introducing additional procedural protections is not great, especially since it would undoubtedly result in fewer unnecessary suspensions being enforced, which would help to balance the burden on Defendants. It may be administratively tedious to implement pre-deprivation ability-to-pay hearings for all individuals who wish to assert inability to pay as a defense against license suspension, but the state cannot simply claim that respecting constitutional

rights is too much work. And Defendants themselves need not conduct hearings; they have the option of finding a way of ensuring that Montana's courts are assessing ability to pay either before ordering fines, costs, and restitution or before notifying Defendants that a person has failed to pay (thus triggering license suspension). For example, Defendants could simply require that the courts provide a specific certification that ability to pay was considered in assessing the amount owed when they send a notice for Defendants to suspend a driver's license for failure to pay a fine, cost, or restitution. As discussed below in section IV.B.ii, Defendants cannot simply assume that such ability-to-pay considerations are taking place in all Montana courts.

### ii. *Dixon v. Love* Permits a Driver's License to Be Suspended Without a Pre-Deprivation Hearing Only in Emergency Circumstances

Defendants cite *Dixon v. Love* for the assertion that a license can be suspended without a hearing, but this read of *Dixon* is too broad. Defs.' Summ. J. Br., ECF No. 75 at 16 (citing *Dixon v. Love*, 431 U.S. 105, 112–13 (1977)). *Dixon* deals with "a driver who repeatedly has been convicted of traffic offenses" and thus implicates "the important public interest in safety on the roads and highways." 431 U.S. at 107, 114. The holding in *Dixon* is specifically limited to circumstances in which the public interest in safety is at stake: "the public interests present *under the circumstances of this case* are sufficiently visible and weighty for the State to make

its summary initial decision effective without a predecision administrative hearing." *Id.* at 114 (emphasis added). By contrast, failure to pay is not an emergency and does not threaten public safety. *See Robinson*, 326 F.R.D. at 162 ("The scheme in *Dixon* was targeted at drivers who had amassed traffic offenses that could give rise to a reasonable inference that they were significantly more likely than the average driver to pose a risk to public safety if allowed on the road."); *see also Bell*, 402 U.S. at 542 ("except in emergency situations (and this is not one)[,] due process requires that when a State seeks to terminate an interest such as that here involved, it must afford notice and opportunity for hearing appropriate to the nature of the case *before* the termination becomes effective.") (emphasis added) (internal quotation marks omitted). Because Plaintiffs' suspensions were entirely unrelated to safety concerns, they were entitled to pre-deprivation hearings.

**iii. Mr. DiFrancesco Is Entitled to Due Process Even Though He Has Never Had a Driver's License**

The cases Defendants rely upon in support of their argument that Mr. DiFrancesco is not entitled to Due Process because he has never had a valid driver's license are inapposite. Both *Peterson v. United States Department of Interior* and *Bowen v. Public Agencies Opposed to Social Security Entrapment* are takings cases recognizing that Congress cannot rely absolutely on its power to take away property already acquired. *Peterson v. United States Dept. of Interior*, 899 F.2d 799, 808

n.16 (9th Cir. 1990); *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 55 (1986). *Bell v. Burson* states:

> Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.

402 U.S. at 539. The logic of *Bell* is that because a person with an already-issued driver's license may become dependent on that license to earn a living, the state must afford the person adequate due process before suspending the license. Mr. DiFrancesco was a child — fourteen years old — when Defendants preemptively suspended his driving privileges, and he was prevented from ever being eligible to obtain a license once he became old enough because he was never able to resolve his failure-to-pay suspensions fully. Pls.' Undisputed Facts, ECF No. 70 at ¶¶ 13–17. Despite never having been issued a driver's license, Mr. DiFrancesco nevertheless became dependent on driving to earn a living; in fact, it is difficult to imagine how he could have avoided this dependency as a resident of Montana. *Id.* at ¶¶ 7–8, 18, 60–64. Because Mr. DiFrancesco relies on his ability to drive to earn a living, *Bell* instructs that he is entitled to Due Process protections of that ability. Moreover, Mr. DiFrancesco's indigence has disqualified him from the opportunity to apply for a driver's license, an opportunity he should have been entitled to and would have been entitled to if not for his poverty.

### B. Montana's Existing Statutory Scheme Does Not Provide Adequate Procedural Protections

Montana's existing statutory scheme does not provide adequate procedural due process protections because (i) the initial opportunity to contest a violation does not specifically provide an opportunity to assert inability to pay, (ii) Defendants improperly rely on an assumption that Montana judges never impose fines that individuals cannot afford to pay, and (iii) the pre-suspension notice provided to individuals does not offer instructions for avoiding license suspension by asserting inability to pay.

#### i. The Initial Opportunity to Contest a Violation Does Not Specifically Provide an Opportunity to Assert Inability to Pay

Although Montana law requires that a court conduct a sentencing hearing before imposing a sentence or making any other disposition, the required sentencing hearing is not convened for the specific purpose of determining a person's ability to pay a fine, cost, or restitution. Pls.' Undisputed Facts, ECF No. 70 at ¶¶ 41–42. Plaintiffs are entitled not only to an opportunity to be heard, but specifically to a meaningful opportunity to be heard *on the issue of ability to pay*.

#### ii. Defendants Improperly Rely on an Assumption that Montana Judges Never Impose Fines that Individuals Cannot Afford to Pay

Defendants cannot simply assume that all fines, costs, and restitutions imposed in the state of Montana are ordered after careful consideration of each

individual's financial circumstances. *See* Pls.' Undisputed Facts, ECF No. 70 at ¶¶ 38–40. In fact, Defendants have overwhelming evidence that many people cannot afford to pay their court debt in Defendants' own records of the thousands of Montana residents whose licenses have been suspended for failure to pay for years or decades. *Id.* at ¶¶ 51, 53 (2,513 DI Code 601 failure-to-pay suspensions were still in effect as of 2018, and each of these suspensions is at least nine years old; 8,990 DI Code 605 failure-to-pay suspensions were still in effect as of 2018, and each of these suspensions is at least five years old). Defendants' shifting of responsibility to Montana judges is, at best, deliberate indifference to the obvious reality that many Montanans are unable to pay their court debts.

Defendants' reliance on Mont. Code Ann. § 46-18-231(3) is misplaced. Section 46-18-231 is, by its own terms, limited to fines imposed in felony and misdemeanor cases. The Traffic Regulation Chapter of the Motor Vehicles Title (Title 61, Chapter 8) provides that any violation of Chapter 8 is a misdemeanor (unless it is a felony). Mont. Code Ann. § 61-8-711(1). But insurance violations — such as Ms. Davis's only relevant underlying offenses — fall under Chapter 6, Responsibility of Vehicle Users and Owners, which does not contain any provision defining violations as misdemeanors (or felonies). In fact, consistent with this interpretation, insurance violations carry a statutorily-mandated *minimum* fine of $250 for a first offense, a set fine of $350 for a second offense, and a set fine of $500

for a third offense. Mont. Code Ann. § 61-6-304. That is, the statutory scheme itself does not contemplate judicial discretion and therefore is inconsistent with Defendants' assumption that all fines imposed in Montana are affordable based on individuals' financial means.

Moreover, Plaintiffs themselves provide clear evidence that Montana judges order unaffordable fines for indigent individuals at least some of the time. Both Plaintiffs were unable to pay their court-ordered fine amounts, which led to Defendants suspending their licenses. Pls.' Undisputed Facts, ECF No. 70 at ¶¶ 11, 15, 20, 25, 27, 28, 31, 32. Both Plaintiffs remain unable to pay off their court debts, which is why neither is able to drive legally at this time. Thus, Defendants cannot reasonably assume or pretend that every fine, cost, or restitution ordered by a Montana judge is affordable for indigent residents.

#### iii. The Pre-Suspension Notice Does Not Provide Instructions for Avoiding License Suspension by Asserting Inability to Pay

The pre-suspension notice that Defendants provide to individuals does not specifically inform them of any ability-to-pay hearing; thus, the notice requirement of procedural Due Process is entirely unmet. Pls.' Undisputed Facts, ECF No. 70 at ¶ 44. Even if individuals have the option of raising ability to pay in a general hearing, that opportunity is meaningless if no notice is provided to ensure that people are aware that they have the right to assert inability to pay as a defense against suspension. *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 14 (1978)

("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending hearing. Notice in a case of this kind does not comport with constitutional requirements when it does not advise the [individual] of the availability of a procedure for protesting a proposed termination . . . as unjustified."). For this reason alone, Plaintiffs were denied procedural due process.

## V. Conclusion

For all the reasons above, Plaintiffs respectfully request that this Court deny Defendants' Motion for Summary Judgment (ECF No. 72) and grant Plaintiffs' Motion for Summary Judgment as to Liability (ECF No. 69).

Respectfully submitted,

*/s/ Phil Telfeyan*
Phil Telfeyan (*pro hac vice*)
Rebecca Ramaswamy (*pro hac vice*)
Attorneys, Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
rramaswamy@equaljusticeunderlaw.org

*/s/ Robert Farris-Olsen*
Robert Farris-Olsen (MT Bar No. 11937)
Scott Peterson (MT Bar No. 11996)
Attorneys, Morrison, Sherwood, Wilson & Deola, PLLP
401 N. Last Chance Gulch St.
Helena, MT 59601
(406) 442-3261
rfolsen@mswdlaw.com

speterson@mswdlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the above document contains 5,730 words and is therefore compliant with D. Mont. L.R. 7.1(d)(2)(A).

*/s/ Rebecca Ramaswamy*
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2019, I electronically filed the above document with the Clerk of the Court using the ECF System, which will provide electronic copies to the counsel of record.

*/s/ Rebecca Ramaswamy*
Attorney for Plaintiffs